UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HECTOR BATISTA,

                                        Plaintiff,

v.                                                                        9:03-CV-0523
                                                                          (DNH/GHL)
GLENN S. GOORD, Commissioner of N.Y.S. D.O.C.S.;
PORTUANDO, Superintendent of Shawangunk Correctional
Facility; W. MANY, Deputy Superintendent of Security at
Shawangunk Correctional Facility; DONALD SELSKY,
Director of Special Housing Unit for N.Y.S. D.O.C.S.;
S. DEUTSCH, Facility Steward at Shawangunk Correctional
Facility; S. RENDER, Corrections Officer at Shawangunk
Correctional Facility; DEBORAH P. BEACH, Forensic
Scientist III for N.Y.S. Police,

                                        Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

HECTOR BATISTA
93-A-0862
Plaintiff, *Pro Se*
Attica Correctional Facility
P.O. Box 149
Attica, NY  14011-0149

HON. ELIOT L. SPITZER                                 MARIA MORAN, ESQ.
Attorney General of the State of New York             Assistant Attorney General
Counsel for Defendants
615 Erie Boulevard West
Suite 102
Syracuse, NY  13204-2455

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

_____This matter has been referred to me for Report and Recommendation by the Honorable

David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

N.D.N.Y. 72.3(c).  In this civil rights complaint brought under 42 U.S.C. § 1983, Plaintiff (a

prisoner) alleges that Defendants (six employees of the New York State Department of

Correctional Services ["D.O.C.S."] and one employee of the New York State Division of State

Police ["N.Y.S.P."]) violated his Eighth and Fourteenth Amendment rights in connection with a

disciplinary sanction that was imposed on him for drug possession in January of 2001 at

Shawangunk Correctional Facility ("Shawangunk C.F.").  (Dkt. No. 1.)[1]

---

[1]        More specifically, liberally construed, Plaintiff's _pro se_ complaint asserts the
following claims against Defendants in their individual and official capacities:

(1) **S. Redner**, a Correction Officer ("C.O.") at Shawangunk C.F., intentionally or
recklessly submitted false test results of the substance found on Plaintiff's person on January 6,
2001, which Plaintiff had informed C.O. Redner consisted of powdered multi-vitamins;

(2) **Leonard A. Portuondo**, Superintendent of Shawangunk C.F., intentionally or
recklessly disregarded, and failed to stop, violations of Plaintiff's constitutional rights by merely
forwarding Plaintiff's January 16, 2001 letter to William Many for a response, rather than
personally investigating the subject of that letter;

(3) **William Many**, Deputy Superintendent for Security of Shawangunk C.F.,
intentionally or recklessly disregarded, and failed to stop, violations of Plaintiff's constitutional
rights by merely forwarding Plaintiff's January 16, 2001 letter to Edward W. Deutsch for
consideration, rather than personally investigating the subject of that letter;

(4) **Edward W. Deutsch**, Facility Steward at Shawangunk C.F., intentionally or
recklessly found Plaintiff guilty of the drug possession charge despite the exculpatory evidence in
the case, including the fact that a test performed by C.O. Lt. Harold Jones was negative for drugs;

(5) **Donald Selsky**, Director of Special Housing / Inmate Discipline Programs for
D.O.C.S., intentionally or recklessly disregarded, and failed to stop, violations of Plaintiff's
constitutional rights by merely modifying, rather than reversing, Plaintiff's disciplinary hearing
sentence of one year's confinement in the S.H.U.;

(6) **Glenn S. Goord**, Commissioner of D.O.C.S., intentionally or recklessly disregarded,
and failed to stop, violations of Plaintiff's constitutional rights; and

(7) **Deborah P. Beach**, a Forensic Scientist with the N.Y.S.P., intentionally or recklessly
failed to test the substance in question until three months after that task had been assigned to her,
although she knew that Plaintiff was being punished due to an allegedly positive test result.  (_Id._)

2

Currently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 29.)  Defendants' motion, which Plaintiff has opposed (Dkt. No. 31), raises the following five issues: (1) whether the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) whether Plaintiff has established the personal involvement of Defendants Goord, Portuondo and Beach; (3) whether Plaintiff has established a Fourteenth Amendment Due Process claim; (4) whether Plaintiff has established an Eighth Amendment claim; and (5) whether qualified immunity bars Plaintiff's claims.  (Dkt. No. 29, Part 4.)

For the reasons discussed below, I reach the following conclusions: (1) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) Plaintiff has not established the personal involvement of Defendants Goord, Portuondo and Beach; (3) Plaintiff has not established a Fourteenth Amendment Due Process claim; (4) Plaintiff has not established an Eighth Amendment claim; and (5) qualified immunity bars Plaintiff's claims.  As a result, I recommend that Defendants' motion for summary judgment be granted.

## I.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all

---

[2]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3

reasonable inferences against the moving party.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings.  "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the . . . responsibility of granting significant liberality in how *pro se* pleadings are construed."  *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 467 (S.D.N.Y. 1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir. 1989).  For example, where a plaintiff is proceeding *pro se*, and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to

4

dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).  In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment."  *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted); *accord*, *Durran v. Selsky*, 251 F. Supp.2d 1208, 1211 (W.D.N.Y. 2003) (citations omitted).

## II.    STATEMENT OF MATERIAL FACTS

Generally, the facts set forth in a defendant's Rule 7.1 Statement of Material Facts are deemed admitted to the extent those facts are supported by the evidence in the record[3] and are not specifically controverted by the plaintiff.  *See* Local Rule 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").[4]

---

[3]      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, No. 03-7030, 2004 WL 1472675, at *3 (2d Cir. July 1, 2004) (citations omitted).

[4]      *See Mehlenbacher v. Slafrad, et al.*, No. 9:99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003); *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co., Inc.*, No. 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3 (N.D.N.Y. Mar. 18, 2002); *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001).

To specifically controvert such facts, a plaintiff need not file a response to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and that "set[s] forth a specific citation to the record where the factual issue arises," as described in Local Rule 7.1(a)(3), although that is the preferred method.  Rather, the plaintiff may specifically controvert such facts through a verified complaint and/or an affidavit in opposition to the defendant's motion.[5]

However, such affidavits must, among other things, be based "on personal knowledge." Fed. R. Civ. P. 56(e) (requiring "personal knowledge"); *U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) (citations omitted), *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).  An affidavit is not based on personal knowledge if, for example, it is based on mere suspicion, rumor, hearsay, or secondhand information.  *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

Similarly, such affidavits must not be general and conclusory.  *See Patterson v. County of*

_____

[5]      *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted); Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the . . . affidavits . . . show that there is no genuine issue as to any material fact . . . .").

*Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") (citations omitted); *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting "conclusory" statements in opposing affidavit); *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); Fed. R. Civ. P. 56(e) (requiring more than "mere allegations or denials of . . . [a pleading] . . . but . . . specific facts showing that there is a genuine issue for trial").

Here, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

### Initial Events at Shawangunk C.F.

1.      On January 6, 2001, at approximately 10:37 a.m., while Plaintiff was housed at Shawangunk C.F., he was subjected to a pat frisk by C.O. K. McDonough in the B-Block sallyport area.[6]  During the search, C.O. McDonough found a plastic ziplock bag containing a brown powdery substance in Plaintiff's right front pants pocket.[7]  C.O. McDonough kept the bag and placed Plaintiff on "investigatory keeplock."[8]  He then turned the substance in the bag over

---

[6]      (Dkt. No. 1, ¶¶ 2, 18-19 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 1 [Inmate Misbehavior Report].)

[7]      (Dkt. No. 1, ¶ 22 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 1 [Inmate Misbehavior Report].)

[8]      (Dkt. No. 1, ¶ 22 [Verified Complaint].)

to Defendant Redner for testing.[9]  Defendant Redner conducted a drug test on the substance using

a narcotics identification kit ("NIK") manufactured by the Becton-Dickinson company.[10]

Defendant Redner's initial test indicated the presence of opium alkaloids.[11]  Defendant Redner's

subsequent test indicated the presence of heroin.[12]  As a result, Plaintiff was issued a misbehavior

report for allegedly violating facility rule 113.25 (drug possession).[13]

     2.      On January 7, 2001, at approximately 1:35 p.m., Plaintiff was served with a copy

of the misbehavior report.[14]

     3.      On January 12, 2001, Plaintiff's Tier III Superintendent's hearing commenced,

---

[9]     (Dkt. No. 1, ¶ 23 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A [Inmate Misbehavior Report], 2 [Form 2080].)

[10]     (Dkt. No. 1, ¶¶ 24-26 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A [Inmate Misbehavior Report], 2 [Form 2080], 3 [Contraband Test Procedure].)

[11]     (Dkt. No. 29, Part 6, Ex. A [Inmate Misbehavior Report], 2 [Form 2080], 3 [Contraband Test Procedure].)

[12]     (Dkt. No. 1, ¶¶ 24-26 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A [Inmate Misbehavior Report], 2 [Form 2080], 3 [Contraband Test Procedure].)

[13]     (Dkt. No. 1, ¶ 27 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 1 [Inmate Misbehavior Report]; Dkt. No. 31, ¶ 8 [Plaintiff's Declaration in Opposition].)  I note that, liberally construed, Plaintiff's verified complaint has alleged that Defendant Redner's finding of the presence of heroin in the substance in question was reckless or even fraudulent, as evidenced by the fact that Plaintiff had "informed" Defendant Redner that the substance contained only powdered multivitamins.  (Dkt. No. 1, ¶ 59.)  I do not find that this conclusory allegation is an "undisputed fact" since Plaintiff offers no evidence, and asserts no specific facts, in support of it; and, in any event, it appears to be contradicted by Plaintiff's own complaint.  (Dkt. No. 1, ¶ 21 [alleging that Plaintiff told C.O. McDonough, not Defendant Redner, that the substance contained only powdered multivitamins.)

[14]     (Dkt. No. 29, Part 6, Ex. A at 8 [Hearing Record Sheet].)

with Defendant Deutsch presiding as the hearing officer.[15]  At the hearing, Defendant Deutsch

accepted a substance offered by Plaintiff for testing, and adjourned the hearing.[16]  Defendant

Deutsch then forwarded the substance to Correction Officer ("C.O.") Lt. Harold Jones for

testing.[17]  C.O. Jones conducted a Becton-Dickinson NIK test on the substance, which recorded a

negative result for any drugs.[18]

4.      On January 16, 2001, Plaintiff wrote Defendant Portuondo a letter in which he

requested a second opinion from an outside laboratory regarding the nature of the substance

found on his person on January 6, 2001.[19]

5.      On January 19, 2001, Plaintiff received a memorandum from Defendant Many,

stating that Plaintiff's letter of January 16, 2001, had been forwarded to his office for a

response.[20]  Because plaintiff's disciplinary hearing was still ongoing, Defendant Many

forwarded the letter to Defendant Deutsch for consideration.[21]

_____

[15]      (Dkt. No. 1, ¶ 29 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 8 [Hearing
Record Sheet].)

[16]      (Dkt. No. 1, ¶¶ 30-31 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 8
[Hearing Record Sheet].)

[17]      (Dkt. No. 1, ¶ 31 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 4 [Form
2080], 8 [Hearing Record Sheet].)

[18]      (Dkt. No. 1, ¶ 31 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 4 [Form
2080], 5 [Contraband Test Procedure].)

[19]      (Dkt. No. 29, Part 6, Ex. A at 6 [Letter from Plaintiff dated 1/16/01]; Dkt. No. 1,
¶¶ 32-33 [Verified Complaint].)

[20]      (Dkt. No. 29, Part 6, Ex. A at 7 [Memorandum from Defendant Many dated
1/16/01]; Dkt. No. 1, ¶ 34 [Verified Complaint].)

[21]      (*Id*.)

6.      On January 22, 2001, Defendant Deutsch continued Plaintiff's disciplinary hearing.[22]  Defendant Deutsch found Plaintiff guilty of the drug possession charge.[23]  In his written "Statement of Evidence Relied Upon," Defendant Duetsch wrote the following: "Inmate Misbehavior Report dated 1/6/01 written by C.O. McDonough.  Testimony by C.O. Redner regarding the test he conducted.  C.O. Redner also testified that the substance inmate Batista produced was different from the original substance which was confiscated and tested."[24]  Defendant Deutsch imposed a penalty that included 365 days confinement in the Special Housing Unit ("S.H.U."), with a corresponding loss of packages, phone, commissary, and good-time credits.[25]

7.      On or about January 24, 2001, Plaintiff appealed Defendant Deutsh's determination.[26]

8.      On or about January 25, 2001, it appears that Plaintiff sent a letter to Defendant Many, with a copy to Defendant Goord, requesting the ability to make a telephone call to the New York State Police to inquire as to the test results of the substance in question, which request

---

[22]      (Dkt. No. 1, ¶ 35 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 8 [Hearing Record Sheet].)

[23]      (Dkt. No. 1, ¶ 36 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 9 [Superintendent Hearing Disposition Rendered].)

[24]      (Dkt. No. 29, Part 6, Ex. A at 10 [Superintendent Hearing Disposition Rendered].)

[25]      (Dkt. No. 1, ¶ 36 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. A at 9 [Superintendent Hearing Disposition Rendered].)

[26]      (Dkt. No. 1, ¶ 37 [Verified Complaint].)

was denied.[27]  Also on or about that day, it appears that Plaintiff mailed a letter to Defendant

Goord describing his case, asserting his innocence, and requesting further investigation.[28]

9.      On March 14, 2001, Defendant Selsky modified Plaintiff's penalty to 180 days of

S.H.U. confinement and loss of packages, phone, and commissary.[29]

### Events at the N.Y.S.P.'s Highland Station

10.      Meanwhile, events were occurring at the New York State Police's ("N.Y.S.P.")

Highland Station.  Specifically, on January 6, 2001, C.O. McDonough had turned the substance

confiscated from Plaintiff over to Q.M. Dixon, a N.Y.S.P. Investigator, at Highland Station.[30]

---

[27]      (Dkt. No. 1, ¶ 38 [Verified Complaint, alleging this fact but not attaching a copy of the letter]; Dkt. No. 10, ¶ 3 [Answer, denying knowledge and information sufficient to form a belief for responding to the allegation].)

[28]      (Dkt. No. 1, ¶ 39 [Verified Complaint, alleging this fact but not attaching a copy of the letter]; Dkt. No. 10, ¶ 3 [Answer, denying knowledge and information sufficient to form a belief for responding to the allegation].)  I note that Plaintiff alleges that his letter, among other things, "explain[ed] the circumstances surrounding his Special Housing Unit placement and pending criminal charges."  (Dkt. No. 1, ¶ 39.)  Even liberally construing this allegation, I do not understand it to mean that Plaintiff described anything more than a mistake (or negligence) in the conducting of the drug test of the substance found on his person.  First, an implied allegation by Plaintiff in this letter that there had been a reckless or intentional error in the drug testing process would be wholly conclusory (and self-serving to Plaintiff), since Plaintiff did not offer a copy of this letter to the Court.  Second, this interpretation of Plaintiff's allegations regarding his January 25, 2001, letter to Defendant Goord is consistent with Plaintiff's allegations regarding his January 16, 2001, letter to Defendant Portuondo, which Plaintiff also characterized as "clearly outlining the circumstances surrounding his immediate keeplock status" but which implied (at most) merely that a mistake had been made in the original testing of the substance found on his person.  (*Compare* Dkt. No. 1, ¶¶ 32-33 [Plaintiff's Verified Complaint] *with* Dkt. No. 29, Part 6, Ex. A at 6 [Letter from Plaintiff dated 1/16/01].)

[29]      (Dkt. No. 1, ¶ 42 [Verified Complaint]; Dkt. No. 29, Part 6, Ex. B [Review of Superintendent's Hearing].)

[30]      (Dkt. No. 1, ¶ 28 [Verified Complaint]; Dkt. No. 29, Part 5, Ex. 1 at 1 [N.Y.S.P. Evidence Submission Form].)

11

Highland Station had then assigned case number 01-21 to Plaintiff's criminal matter.[31]

11.     On January 18, 2001, Highland Station gave the substance to the N.Y.S.P. Mid-Hudson Regional Crime Laboratory ("N.Y.S.P. Crime Laboratory" or "Lab").[32]  Upon arrival at the Lab, the substance was assigned Lab case number 01N-228 and placed in the Lab's vault.[33]

12.     On March 7, 2001, Ulster County Assistant District Attorney Paul O'Neill called the N.Y.S.P. Crime Laboratory and requested a "rush" on Lab case number 01N-228, since Plaintiff's parallel New York State court criminal matter was proceeding to trial.[34]  The N.Y.S.P. Crime Laboratory assigned Lab case number 01N-228 to Defendant Beach, a forensic scientist at the Lab.[35]

---

[31]     (Dkt. No. 29, Part 5, Ex. 1 at 1 [N.Y.S.P. Evidence Submission Form]; Dkt. No. 29, Part 6, Ex. C [N.Y.S.P. Receipt].)

[32]     (Dkt. No. 29, Part 5, Ex. 1 at 1 [N.Y.S.P. Evidence Submission Form]; Dkt. No. 29, Part 5, Ex. 1 at 2 [N.Y.S.P. Crime Laboratory Case Receipt Record]; Dkt. No. 29, Part 6, ¶ 2 [Beach Affid.].)

[33]     (*Id.*)

[34]     (Dkt. No. 29, Part 5, ¶ 3 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 2 [Laboratory Rush Request].)

[35]     (Dkt. No. 29, Part 5, ¶ 4 [Beach Affid.].)  I note that Plaintiff implicitly alleges that the N.Y.S.P. Crime Laboratory assigned Lab case number 01N-228 to Defendant Beach approximately three months before March 7, 2001.  (Dkt. No. 1, ¶ 60 [alleging that "Defendant Beach . . . did not cause [authorities] to become aware of the NEGATIVE RESULTS of her own testing of the substance until March 9, 2001, more than three (3) months after the substance had been assigned to her for analyzation."].)  However, I do not find that this allegation is of sufficient evidentiary value to "dispute" Defendants' aforementioned factual assertion for two reasons: (1) Plaintiff's allegation contains an obvious factual error (i.e., the testing of the substance in question could not have been assigned to Defendant Beach *three* months before March 9, 2001, since that substance was found on Plaintiff's person only *two* months before March 9, 2001); and (2) Plaintiff offers no evidence, and asserts no specific facts, in support of his apparent assumption that the N.Y.S.P. assigned the testing of the substance to Defendant Beach immediately upon the receipt of that substance by Investigator Dixon on January 6, 2001.

13.     On March 8, 2001, Defendant Beach received the evidence in Lab case number

01N-228 from the Evidence Clerk and brought it to her work station.[36]  First, she examined the

N.Y.S.P. Evidence Submission Form, which indicated that the evidence, a small plastic bag that

had been found in the possession of an inmate, was to be tested for heroin.[37]  (The form did not

indicate Plaintiff's name, and Defendant Beach had no knowledge of Plaintiff's identity or the

fact that Plaintiff was "undergoing institutional punishment.")[38]  Next Defendant Beach removed

the substance from the bag and noted that the substance appeared to be a brown powder.[39]  Then

she weighed the substance, determining that it weighed 1.07 grams.[40]  After that, she performed

two tests on the substance–a color test and a thin layer chromatography test–the results of which

were both inconclusive.[41]  Finally, she performed additional instrumental analysis on the

---

(See also Dkt. No. 1, ¶ 28 [not alleging that the N.Y.S.P. assigned the case to Defendant Beach on or about January 6, 2001, when it received a sample of the substance], accord, Dkt. No. 31, ¶¶ 9, 11 [Plaintiff's Declaration in Opposition].)

[36]     (Dkt. No. 29, Part 5, ¶ 5 [Beach Affid.].)

[37]     (Dkt. No. 29, Part 5, ¶ 5 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 1 at 1 [N.Y.S.P. Evidence Submission Form].)

[38]     (Dkt. No. 29, Part 5, ¶¶ 5, 12 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 1 at 1 [N.Y.S.P. Evidence Submission Form].)  I note that Plaintiff alleges that Defendant Beach knew that the substance had previously tested positive for heroin and that Plaintiff was being institutionally punished for possessing heroin.  (Dkt. No. 1, ¶ 60.)  I find that this allegation is not of sufficient evidentiary value to "dispute" Defendant Beach's aforementioned factual assertion because Plaintiff offers no evidence, and asserts no specific facts, in support of his conclusory allegation, which is (in any event) contradicted by Defendant Beach's testimony and the N.Y.S.P. Evidence Submission Form.

[39]     (Dkt. No. 29, Part 5, ¶ 6 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 3 at 2 [Beach's Case Notes].)

[40]     (Id.)

[41]     (Id.)

substance, using both a Mass Selective Detector and an Infrared Spectrophotometer.[42]  While this analysis resulted in a finding of traces of cocaine, those traces were not of a sufficient quantity to conclude that the substance in the bag was in fact a controlled substance.[43]

14.     On March 9, 2001, Defendant Beach concluded that the 1.07 grams of brown powder contained in the plastic bag bearing case number 01N-228 was negative for the presence of a controlled substance.[44]  She prepared and signed a certified report of her examination.[45] (Presumably, a secretary at the N.Y.S.P. Crime Laboratory then, at some point, distributed the report to N.Y.S.P. Captain Melville and Ulter County Assistant District Attorney O'Neill.)[46]

15.     On March 19, 2001, Charles W. Foster, a N.Y.S.P. Investigator, picked up the evidence in Lab case number 01N-228 from the N.Y.S.P. Crime Laboratory.[47]

16.     On April 11, 2001, N.Y.S.P. Investigator Dixon returned the evidence in Lab case number 01N-228 to Defendant Many at Shawangunk C.F.[48]

---

[42]     (Dkt. No. 29, Part 5, ¶ 7 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 3 at 2-10 [Beach's Case Notes].)

[43]     (Dkt. No. 29, Part 5, ¶ 7 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 3 at 1-10 [Beach's Case Notes].)

[44]     (Dkt. No. 29, Part 5, ¶ 8 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 3 at 1 [Beach's Case Notes]; Dkt. No. 1, ¶ 6 [Verified Complaint].)

[45]     (Dkt. No. 29, Part 5, ¶ 9 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 4 [Beach's Certified Examination Report].)

[46]     (Dkt. No. 29, Part 5, ¶ 10 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 4 [Beach's Certified Examination Report].)

[47]     (Dkt. No. 29, Part 5, ¶ 11 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 1 at 3 [N.Y.S.P. Crime Laboratory Evidence Receipt].)

[48]     (Dkt. No. 29, Part 6, Ex. C at 1-2 [N.Y.S.P. Receipt and Form 2080].)

**Subsequent Events at Shawangunk C.F.**

17.     On April 12, 2001, Defendant Many had C.O. L. Giordiano retest the substance, using the Beckon-Dickinson NIK test.[49]  The final test results were inconclusive.[50]  A representative of Shawangunk C.F. called Defendant Selsky, who reversed Plaintiff's January 22, 2001, Superintendent's Hearing Determination.[51]  Plaintiff was then released from S.H.U.[52]

18.     On April 13, 2001, Sergeant G. Palen recommended that Plaintiff be placed in Involuntary Protective Custody ("I.P.C.").[53]  The recommendation was authorized by Lieutenant Pingotti.[54]  The I.P.C. hearing was conducted by Deputy Superintendent for Programs Evan Gorelick.[55]  At the hearing, Plaintiff admitted that he owed over $3,000.000 to inmates in the facility, and that he needed protection.[56]  Furthermore, while Plaintiff would not sign himself into

---

[49]     (Dkt. No. 29, Part 6, Ex. C at 2-3 [Form 2080 and Contraband Test Procedure]; Dkt. No. 1, ¶ 45 [Verified Complaint].)

[50]     (*Id*.)

[51]     (Dkt. No. 29, Part 6, Ex. C at 2 [Form 2080]; Dkt. No. 29, Part 6, Ex. D [Review of Superintendent's Hearing]; Dkt. No. 1, ¶ 46 [Verified Complaint]; Dkt. No. 31, ¶ 20 [Plaintiff's Declaration in Opposition].)

[52]     (Dkt. No. 29, Part 6, Ex. C at 2 [Form 2080]; Dkt. No. 1, ¶¶ 46-47 [Verified Complaint]; Dkt. No. 31, ¶ 20 [Plaintiff's Declaration in Opposition].)

[53]     (Dkt. No. 29, Part 6, Ex. E at 1 [Involuntary Protective Custody Recommendation].)

[54]     (*Id*.)

[55]     (Dkt. No. 29, Part 6, Ex. E at 2-3 [Hearing Record Sheet and Involuntary Protective Custody Hearing Determination].)

[56]     (Dkt. No. 29, Part 6, Ex. E at 3 [Involuntary Protective Custody Hearing Determination].)

protective custody, he agreed to I.P.C.[57]

19.     On or about October 11, 2001, Lieutenant A.C. Wright issued Plaintiff a misbehavior report.[58]  The asserted grounds for the misbehavior report were that Plaintiff had, early that day, become hostile toward, and threatened, Captain Connolly.[59]

20.     Plaintiff's disciplinary hearing commenced on October 16, 2001, and concluded on October 29, 2001.[60]  The hearing officer was S.C.C.P. Mitoran, who determined at the hearing that Plaintiff was guilty of violating facility rules 104.11 (violent conduct), and 102.10 (threats).[61] As a result of this determination, Plaintiff was sentenced to, among other things, six months' confinement in S.H.U.[62]

---

[57]     (*Id*.)  I note that Plaintiff alleges that his placement in Involuntary Protective Custody "was induced by Defendant Many."  (Dkt. No. 1, ¶ 48.)  I do not find that this conclusory allegation is an "undisputed fact" since Plaintiff offers no evidence, and asserts no specific facts, in support of it; and, in any event, it is contradicted by the aforementioned evidence offered by Defendants.

[58]     (Dkt. No. 29, Part 6, Ex. F at 1 [Inmate Misbehavior Report].)

[59]     (*Id*.)

[60]     (Dkt. No. 29, Part 6, Ex. F at 2 [Superintendent Hearing Disposition Rendered].)

[61]     (Dkt. No. 29, Part 6, Ex. F at 2-3 [Superintendent Hearing Disposition Rendered].)

[62]     (Dkt. No. 29, Part 6, Ex. F at 2-3 [Superintendent Hearing Disposition Rendered].)  Plaintiff alleges that his placement in S.H.U. in October 2001 resulted not from a finding of guilt at a disciplinary hearing but from a desire to retaliate against Plaintiff for "earlier events."  (Dkt. No. 1, ¶¶ 53-54.)  I do not find that this vague and conclusory allegation is an "undisputed fact" since Plaintiff offers no evidence, and asserts no specific facts, in support of it; and, in any event, it is contradicted by the aforementioned evidence offered by Defendants.

### III.   ANALYSIS

####   A.   Whether the Eleventh Amendment Bars Plaintiff's Claims Against Defendants in Their Official Capacities

Defendants' argument regarding the Eleventh Amendment is brief and to the point: to the extent that Plaintiff asserts claims against Defendants in their official capacities, those claims are barred by the Eleventh Amendment.  (Dkt. No. 29, Part 4 at 5-6 [citing cases].)  Liberally construed, Plaintiff's response appears to be that (1) his official-capacity claims survive the prohibition of the Eleventh Amendment because those claims are inextricably intertwined with his individual-capacity claims, and/or (2) his official-capacity claims survive because they are in fact personal-capacity claims.  (Dkt. No. 31, ¶ 49 [Plaintiff's Brief in Opposition].)  However they are construed, Plaintiff's arguments fail.

The Eleventh Amendment to the U.S. Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any of the United States by Citizens of another State . . . ." U.S. Const. amend XI.  It is well established that the Eleventh Amendment bars suits not only against a state when it is named as a party but also when it is the party in fact.  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (citation omitted).

Even the cases cited by Plaintiff recognize that official-capacity claims under 42 U.S.C. § 1983 are distinct from individual-capacity claims  under 42 U.S.C. § 1983, and are barred by the Eleventh Amendment even when such individual-capacity claims survive.  *See Hafer v. Melo*, 502 U.S. 21, 29-30 (1991) (while Eleventh Amendment erects barrier against suits to impose official or representative liability on state officers under Section 1983, it does not erect barrier

17

against suits to impose individual and personal liability on state officers under Section 1983);
*accord*, *Scheuer v. Rhodes*, 416 U.S. 232, 237-238 (1974), *Farid v. Smith*, 850 F.2d , 917, 920-921 (2d Cir. 1988).

As a result, I recommend that the Court dismiss Plaintiff's complaint to the extent that complaint asserts claims against Defendants in their official capacities.

**B.  Whether Plaintiff Has Established the Personal Involvement of Defendants Goord, Portuondo and Beach**

At the risk of oversimplifying Defendants' argument, Defendants essentially argue that Defendants Goord, Portuondo and Beach were not personally involved in the alleged constitutional violations because: (1) Plaintiff has not shown that Defendant Goord ever *received* Plaintiff's January 25, 2001, letter, and, in any event, a single letter of protest is insufficient to establish the personal involvement of a supervisor under Section 1983; (2) Defendant Portuondo received only one letter of protest from Plaintiff (dated January 16, 2001), and, again, a single letter of protest is insufficient to establish the personal involvement of a supervisor under Section 1983, especially where that supervisor refers the matter to a subordinate for follow-up action; and (3) Defendant Beach was not assigned to Plaintiff's case until March 7, 2001, and, in any event, she did not know Plaintiff's name or the specifics of his case.  (Dkt. No. 29, Part 4 at 6-9.)

In response, Plaintiff argues that (1) Defendant Goord is liable under Section 1983 because he was on constructive notice of the alleged constitutional violations, (2) Defendant Portuondo's receipt of Plaintiff's letter of January 16, 2001, was sufficient to make him personally involved under Section 1983, and (3) there is no need to dismiss Plaintiff's claim against Defendant Beach with prejudice because Plaintiff is willing to voluntarily dismiss that

18

claim without prejudice.  (Dkt. No. 31, ¶¶ 6, 7, 13, 19, 20, 23-30 [Plaintiff's Brief in Opposition];

Dkt. No. 31, ¶¶ 21, 23 [Plaintiff's Declaration in Opposition].)  Plaintiff's arguments fail.

> **i.      Defendant Goord**

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a

finding of liability in a Section 1983 action.  *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

Supervisory officials are personally involved in a constitutional violation if: (1) they directly

participated in that violation; (2) they failed to remedy that violation after learning of it through a

report or appeal; (3) they created, or allowed to continue, a policy or custom under which the

violation occurred; (4) they were grossly negligent in managing subordinates who caused the

violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995) (adding fifth prong); *Wright v. Smith.* 21 F.3d 496, 501 (2d Cir. 1994) (adding fifth

prong); *Williams v. Smith*, 781 F.2d 319, 323-324 (2d Cir. 1986) (setting forth four prongs).

As Defendants point out, Plaintiff has offered no evidence indicating that DOCS

Commissioner Goord actually received Plaintiff's sole letter to him, dated January 25, 2001.

Plaintiff has not provided the Court with a photocopy of this letter or its stamped envelope, nor

has he obtained the letter from Defendants' files through discovery.  Rather, Plaintiff merely has

offered his sworn allegation that he sent the letter and a brief summary of its contents.  (Dkt. No.

1, ¶ 40.)

Even if Defendant Goord had actually received Plaintiff's letter to him of January 25,

2005, *and* a copy of Plaintiff's letter to Defendant Many of that same date, I find that those two

19

letters would not have been sufficient to demonstrate Defendant Goord's personal involvement in

the violations Plaintiff alleges.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)

("[Plaintiff's two] letters [to DOCS Commissioner] and [DOCS Commissioner's] response do

not demonstrate the requisite personal involvement on [the DOCS Comissioner's] part.").

Although my finding needs no further support, it is further supported by the fact that those two

letters failed to describe intentional or reckless wrongdoing during the drug testing in question.

(*See*, *supra*, Statement of Material Fact Nos. 7 and 8, and note 28.)  Rather, they described

merely a mistake (or negligence) during the drug testing in question, which is not a constitutional

violation.[63]  Thus, the letters would not have been enough to notify Defendant Goord of

Plaintiff's alleged constitutional violations.[64]

The cases cited by Plaintiff to support a finding of actual or constructive knowledge by

---

[63]        *See Williams v. Wilkinson*, 01-3082, 2002 U.S. App. LEXIS 23774, at *4, 10-13
(6th Cir. Nov. 15, 2002) (negligent drug testing procedures do not violate due process); *Rodriguez
v. Northampton County*, 00-CV-1898, 2003 U.S. Dist. LEXIS 19567, at *10-11 (E.D. Pa. Oct.
20, 2003) (negligent drug testing procedures do not violate due process); *Alnut v. Cleary*, 913 F.
Supp. 160, 164-166 (W.D.N.Y. 1996) (alleged false misbehavior report that resulted from prison
official's failure to recalibrate drug-testing machine before plaintiff's drug test did not violate
plaintiff's constitutional rights); *Sullivan v. Fowler*, 89-CV-71930, 1992 U.S. Dist. LEXIS 7632,
at *16-17 (E.D. Mich. May 14, 1992) (negligent drug testing procedures do not violate due
process); *Basil v. D.C. Dept. of Corr.*, 89-CV-1231, 1990 U.S. Dist. LEXIS 2951, at *11-13
(D.D.C. March 19, 1990) (negligence in conducting drug test does not violate due process); s*ee
generally Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process
Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or
injury to life, liberty, or property."); *Estelle v. Gamble*, 429 U.S. 97, 105-106 ("An accident,
although it may produce added anguish, is not on that basis alone to be characterized as a wanton
infliction of unnecessary pain [under the Eighth Amendment].").

[64]        *See Wright v. Smith*. 21 F.3d 496, 501 (2d Cir. 1994) reaching same conclusion
regarding prisoner's letter to DOCS Commissioner because of omissions from that letter);
*Richardson v. Coughlin*, 101 F. Supp.2d 127, 131 (W.D.N.Y. 2000) (reaching same conclusion
regarding prisoner's letter to superintendent because of omissions from that letter).

Defendant Goord are distinguishable.  (Dkt. No. 31, ¶¶ 23-24 [Plaintiff's Brief in Opposition].)

Specifically, the DOCS Commissioners in *McCann v. Coughlin* and *Morgan v. Ward* were found

by the district court to have had actual or constructive notice of the constitutional violations

alleged by the plaintiffs, because those violations resulted from unlawful prison procedures.[65]

Here, the constitutional violations alleged by Plaintiff result, not from unlawful prison

procedures of which Defendant Goord should have been aware, but from Defendant Redner's

(alleged) reckless failure to comply with lawful prison procedures (i.e., Shawangunk C.F.'s

proper procedure regarding drug testing).  *See Brito v. Ruff*, 88-CV-8064, 1992 WL 163036, at

*2 (S.D.N.Y. June 18, 1992) (distinguishing *McCann* on similar grounds).

As a result, I recommend that the Court dismiss Plaintiffs' claims against Defendant

Goord.

### ii.    Defendant Portuondo

A similar analysis applies to Defendant Portuondo, who was the Superintendent of

Shawangunk C.F.  Specifically, the receipt of one letter by a prison superintendent is generally

not itself enough to demonstrate his personal involvement in the constitutional violations alleged

---

[65]    *See McCann v. Coughlin*, 698 F.2d 112, 118-119, 125 & n.6 (2d Cir. 1983)
(accepting as true district court's finding that DOCS Commissioner had personal involvement in
due process violations committed by a prison "Adjustment Committee"--a statutorily created
three-member board whose duty it was to obtain the facts concerning an alleged incident of
inmate misbehavior--through its procedures because the district court found that the DOCS
Commissioner had either actual or constructive notice of those procedures and defendants did not
challenge that finding on appeal); *Morgan v. Warn*, 699 F. Supp. 1025, 1030-1031, 1046
(N.D.N.Y. 1988) (finding that DOCS Commissioner had personal involvement in procedural
violations committed by a prison "Adjustment Committee" through its procedures because he
had constructive notice of those procedures).

by a plaintiff.[66]  In addition, Plaintiff's January 16, 2001, letter to Defendant Portuondo failed to

describe intentional or reckless wrongdoing during the original testing of the substance found on

his person.  (Dkt. No. 29, Part 6, Ex. A at 6 [Letter from Plaintiff dated 1/16/01].)  At most, the

letter implied that there had been a mistake (or negligence) during the testing of the substance,

which is not a constitutional violation.  *See*, *supra*, note 63.

In any event, Defendant Portunodo responded to the letter by forwarding it for action to

his subordinate, Defendant Many, who wrote Plaintiff a status letter.  (Dkt. No. 29, Part 6, Ex. A

at 7 [Memorandum from Defendant Many dated 1/16/01]; Dkt. No. 1, ¶ 34 [Verified

Complaint].)  These facts are insufficient to establish the personal involvement of Defendant

Portuondo.[67]

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendant

Portuondo.

---

[66]     *See Richardson v. Coughlin*, 101 F. Supp.2d 127, 132 (W.D.N.Y. 2000) ("Even assuming that [the superintendent] received plaintiff's letter, yet took no action, plaintiff has still not established [the superintendent's] personal involvement in the alleged constitutional deprivation.") (citations omitted).

[67]     *See Sealy v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (no personal involvement by DOCS Commissioner where plaintiff sent two letters to DOCS Commissioner who responded to first letter by forwarding it to the Director of Special Housing / Inmate Discipline for decision, and who responded to second letter–a status inquiry–by informing plaintiff that the Director had reached a decision); *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) (finding no reason to conclude that superintendent, in response to plaintiff's letter, should have intervened in scheduled Tier III hearing--"an established procedure in which [plaintiff] was to be given the opportunity to substantiate the claim that he had made in his letter.")

### iii.    Defendant Beach

Plaintiff's claims against Defendant Beach are even weaker than his claims against

Defendants Goord and Portudondo.  There is absolutely no evidence that: (1) Defendant Beach

was assigned the task of testing the substance in question until March 8, 2001; (2) she delayed in

testing that substance after she received the task; (3) she delayed in preparing and signing a

certified report of her examination; or (4) she even knew Plaintiff's identity or the fact that he

was "undergoing institutional punishment."  (*See*, *supra*, Statement of Material Fact Nos. 13 and

14.)  Indeed, Defendant Beach's lack of personal involvement appears recognized by Plaintiff,

who has stated that he wishes to voluntarily abandon his claims against her (without prejudice).

(Dkt. No. 31, ¶ 21 [Plaintiff's Declaration in Opposition].)  The Court should not permit Plaintiff

to withdraw his invalid claims against Defendant Beach at this stage of the proceeding, only so

that he may reassert them in a later proceeding.

As a result, I recommend that the Court dismiss Plaintiffs' claims against Defendant

Beach with prejudice.

### C.    Whether Plaintiff Has Established a Fourteenth Amendment Due Process Claim

Defendants essentially advance a two-part argument in support of their position that

Plaintiff has failed to establish a Fourteenth Amendment Due Process claim: (1) Plaintiff has not

shown that he possessed a liberty interest that was interfered with by the state (because New

York statutes do not create a liberty interest regarding S.H.U. confinement, and Plaintiff's

confinement in S.H.U. was not an atypical and significant hardship); and (2) in any event,

Plaintiff has not shown that he was deprived of that liberty interest without being afforded

23

sufficient due process.  (Dkt. No. 29, Part 4 at 9-18.)

Liberally construed, Plaintiff's response is that: (1) he has shown a protected liberty interest, namely, being free from punitive segregation in S.H.U., which is a very serious punishment; and (2) he has shown two violations of due process, namely, Defendant Redner's intentional or reckless submission of a false test result, and Defendant Portuondo's and Defendant Many's failure to retest the substance found on Plaintiff's person.  (Dkt. No. 31, ¶¶ 27-30 [Plaintiff's Brief in Opposition].)  Plaintiff's argument fails.

All of Plaintiff's due process claims ultimately concern his disciplinary matter. Defendant Redner (allegedly) submitted the falsified test result that supported the disciplinary charge.  Defendant Deutsch (allegedly) intentionally or recklessly found Plaintiff guilty of the drug possession charge despite the exculpatory evidence at the disciplinary hearing.  Defendants Portuondo and Many (allegedly) failed to retest the substance in question and use the results to intervene in the disciplinary hearing.  And Defendants Goord, Selsky and Beach (allegedly) intentionally or recklessly disregarded, and failed to stop, the aforementioned due process violations concerning the disciplinary matter and resulting punishment.

In order to establish a procedural due process claim with respect to a disciplinary matter, a plaintiff must show: (1) that he possessed a liberty interest that has been interfered with by the state; and (2) that he was deprived of that interest without being afforded sufficient due process of law. *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  With regard to the second element, the due process procedures that need to be followed in disciplinary hearings include such things as: (1) "advance written notice of the claimed violation"; (2) the opportunity

24

"to call witnesses and present documentary evidence in [the prisoner's] defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff v. McDonald*, 418 U.S. 539, 563, 566 (1974).

Here, Plaintiff was afforded all due process rights regarding his disciplinary matter. For example, on January 6, 2001, the substance found on Plaintiff's person was tested, and retested, using a NIK test. On January 7, 2001, Plaintiff was served with a copy of the misbehavior report. On January 12, 2001, at the disciplinary hearing, he exercised his right to call a witness and to present, and have tested, a sample of what he claimed to be the substance in question. On January 22, 2001, after finding Plaintiff guilty, the hearing officer stated in writing the evidence he relied upon and the reasons for the disciplinary action taken (explaining why he discounted the test results of the substance offered by Plaintiff). And on January 24, 2001, Plaintiff was permitted to appeal his disciplinary conviction. Under the circumstances, Defendants provided Plaintiff with adequate due process.[68]

Simply stated, Plaintiff had no due process right to have the substance retested by an outside laboratory, and to have his disciplinary hearing interrupted, under the circumstances. *See Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988) (urinalysis drug test results--obtained

---

[68]      *See Basil v. D.C. Dept. of Corr.*, 89-CV-1231, 1990 U.S. Dist. LEXIS 2951, at *9-10 (D.D.C. March 19, 1990) ("[D]efendants provided plaintiffs with more than adequate due process. Defendants provided plaintiffs with a copy of the charges, notice of the hearing, and an opportunity to appeal . . . . Although the consequences stemming from plaintiffs' disciplinary action based on what may have been erroneous drug test results are unfortunate, there is simply no constitutional guarantee that all executive decision making must comply with standards that assure error-free determinations.") (internal quotation and citation omitted).

after the performance of initial test and a subsequent confirmatory test--"may be relied upon as sufficient evidence in prison disciplinary hearings"); *see also* 7 N.Y.C.R.R. § 1010.5 ("In a subsequent disciplinary hearing, the positive result of a test of suspected contraband drugs may be used as evidence that the suspected substance is what the test result indicates.").[69]

Indeed, even if Defendant Redner had tested the substance in question only *once* using the NIK test, authority exists for the proposition that Plaintiff's due process rights would not have been violated.  *See Bolanos v. Coughlin*, 91-CV-5330, 1993 U.S. Dist. LEXIS 21212 (S.D.N.Y. Oct. 15, 1993).  In *Bolanos*, defendant-prison officials found a "white powdery substance" in a plastic bag in plaintiff's cell.  Using the Becton-Dickinson NIK test, defendants tested the substance for drugs, and found the presence of cocaine.  They charged Plaintiff with drug possession.  At his disciplinary hearing, plaintiff claimed that the white powdery substance was not cocaine but powdered vitamins; and he requested that the substance be retested. Rejecting this argument, the hearing officer found plaintiff guilty of drug possession.  During plaintiff's administrative appeal of this conviction, an outside lab performed a second test of the substance and found that it did not contain any controlled substances.  As a result, plaintiff's disciplinary conviction was reversed.  In his civil rights complaint, plaintiff alleged that the failure of the disciplinary hearing officer to retest the substance violated plaintiff's rights under the Due Process Clause.  The Southern District rejected this claim, holding that "[i]t was not improper to rely on only one test of the white powder.  The test used was reliable, and it was not

---

[69]     *See also Spence v. Farrier*, 807 F.2d 753, 755-757 (8th Cir. 1986) (where substance was subjected to urinalysis test, and retest, plaintiff had no due process right to "a confirmatory test by alternate methodology").

necessary to send it outside the facility to be tested, as plaintiff requested." *Bolanos*, 1993 U.S. Dist. LEXIS 21212, at *62.

Plaintiff's due process claim against Defendant Redner deserves special attention. To the extent that Plaintiff claims that Defendant Redner acted *negligently*, that claim fails to allege a violation of the Fourteenth Amendment.[70] To the extent that Plaintiff claims that Defendant Redner acted intentionally or recklessly, that claim is wholly conclusory. For example, Plaintiff's Complaint contains only *two* allegations suggesting any wrongful intent by Defendant Redner: (1) that Defendant Redner *knew* the substance in question consisted merely of powdered multivitamins when he tested it because, on January 6, 2001, Plaintiff had "informed" Defendant Redner of that fact;[71] and (2) that, at some point after the disciplinary conviction had been reversed, Defendant Redner "induced" Plaintiff's placement in protective custody.[72] (In addition, Plaintiff's opposition papers allege that Defendant Redner offered intentionally false testimony during Plaintiff's disciplinary hearing.)[73] The problem with these allegations is that they are far too general, they are completely unsupported by the record, and indeed they are flatly contradicted by the record. (*See*, *e.g.*, *supra*, Statement of Material Fact Nos. 1 and 18, and notes 13 and 57.)[74]

---

[70]     *See*, *supra*, note 63 (citing cases).

[71]     (Dkt. No. 1, ¶ 59 [Verified Complaint].)

[72]     (Dkt. No. 1, ¶ 48 [Verified Complaint].)

[73]     (Dkt. No. 31, ¶ 27 [Declaration in Opposition]; Dkt. No. 31, ¶ 15 [Brief in Opposition].)

[74]     Also undermining any allegation of an *intentional* or *reckless* drug-testing error by Defendant Redner, and supporting an inference of a *reasonable mistake* by him, is the fact

In addition, Plaintiff's claim against Defendant Redner faces an additional hurdle.  To state a due process claim against Defendant Redner for causing a false disciplinary charge to be filed against Plaintiff, Plaintiff must allege and show that Defendant Redner acted in retaliation for Plaintiff's exercise of a constitutionally protected right.[75]  However, Plaintiff fails to allege or show any facts indicating what *constitutional right* Plaintiff had been exercising prior to Defendant Redner's testing of the substance in question on January 6, 2001, that led to such intentional retaliation by Defendant Redner.

Because sufficient reasons exist to recommend dismissal of Plaintiff's due process claims based on Defendants' second argument (i.e., that Plaintiff has not shown that he was deprived of that liberty interest without being afforded sufficient due process), I need not, and do not, discuss their first argument (i.e., that Plaintiff has not shown that he possessed a liberty interest that was interfered with by the state).

---

Defendant Beach found that the substance contained "traces" of cocaine but that those traces were simply not of a sufficient quantity to conclude that the substance was in fact a controlled substance.  (Dkt. No. 29, Part 5, ¶ 7 [Beach Affid.]; Dkt. No. 29, Part 5, Ex. 3 at 1-10 [Beach's Case Notes].)

[75]     "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 [2d Cir. 1986]), *accord*, *Pittman v. Forte*, 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002).  In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986).  The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when they are made in "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

28

**D.      Whether Plaintiff Has Established an Eighth Amendment Claim**

Again, Defendants advance a two-part argument in support of their position that Plaintiff has failed to establish an Eighth Amendment "cruel and unusual punishment" claim: (1) Plaintiff's complaint contains no factual allegations indicating that the 96 days he spent in S.H.U. caused him to suffer conditions which were sufficiently serious to state an Eighth Amendment claim; and (2) in any event, Plaintiff has failed to establish that any of the Defendants acted with deliberate indifference to his health or safety.  (Dkt. No. 29, Part 4 at 18-19.)

Liberally construed, Plaintiff's response is that: (1) the conditions of his confinement in S.H.U. were sufficiently serious in this particular circumstance; and (2) Defendants acted with the requisite deliberateness by *punishing* him, which is a deliberate act.  (Dkt. No. 31, ¶¶ 33-39 [Plaintiff's Brief in Opposition].)  Plaintiff's argument fails.

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'. . . .   [Second,] a prison official must have a 'sufficiently culpable state of mind.'"  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety . . . ."  *Farmer*, 511 U.S. at 834.

Here, Plaintiff has offered no facts indicating the requisite deliberate indifference. Rather, the facts are clear that: (1) at most, Defendant Redner made an honest mistake in administering the NIK test; (2) Defendant Deutsch afforded Plaintiff adequate due process at his disciplinary hearing; (3) Defendants Goord, Selsky, Portuondo and Many acted responsibly under the circumstances–they had no duty to retest the substance in question and intervene in the

29

disciplinary hearing and resulting punishment; and (4) once Defendant Beach (who did not even know Plaintiff's name) was assigned the substance in question, she promptly tested that substance and reported her findings.

In an attempt to thwart this conclusion, Plaintiff relies on *Johnson v. Glick* for the proposition that "[t]he thread common to all [Eighth Amendment] cases is that 'punishment' has been deliberately administered for a penal or disciplinary purpose . . . ."  481 F.2d 1028, 1032 (2d Cir. 1973) (citations omitted), *overruled on other grounds*, *Graham v. Connor*, 490 U.S. 386 (1989).  However, the deliberate administration of punishment for penal or disciplinary purposes is not the same thing as the deliberate indifference to inmate health or safety.  Indeed, under Plaintiff's reasoning, a plaintiff-prisoner would never have to show the second element of an Eighth Amendment claim (i.e., a sufficiently culpable state of mind on the part of defendants), because the fact that he is in prison shows that defendants are *deliberately* punishing him.

Because sufficient reasons exist to recommend dismissal of Plaintiff's Eighth Amendment claims based on Defendants' second argument (i.e., that Plaintiff has not shown that Defendants acted with a sufficiently culpable state of mind), I need not, and do not, discuss their first argument (i.e., that Plaintiff has not shown that he experienced conditions that were sufficiently serious).[76]

---

[76]      Apparently recognizing the lack of a culpable state of mind on the part of Defendant Selsky and Defendant Beach, Plaintiff has offered to voluntarily abandon his claims against those Defendants (without prejudice).  (Dkt. No. 31, ¶ 21 [Plaintiff's Declaration in Opposition].)  Again, the Court should not permit Plaintiff to withdraw his invalid claims against Defendants Selsky and Beach at this stage of the proceeding, only so that he may reassert them in a later proceeding.  Rather, I recommend that the Court dismiss those claims with prejudice.

### E.       Whether Qualified Immunity Bars Plaintiff's Claims

Again, Defendants advance a two-part argument in support of their position that qualified

immunity bars Plaintiff's claims: (1) none of the Eighth Amendment or Fourteenth Amendment

rights that Plaintiff claims Defendants violated were "clearly established"; and (2) even if those

rights were clearly established, a reasonable person would not have known that he was violating

such a clearly established right.  (Dkt. No. 29, Part 4 at 19-21.)  Even liberally construed,

Plaintiff's opposition papers appear devoid of any response to this argument.  (Dkt. No. 31

[Plaintiff's Declaration in Opposition & Brief in Opposition].)  I agree with Defendants.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless

defendant's alleged conduct, when committed, violated 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Williams*, 781 F.2d at

322 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).  Regarding the issue of whether a

particular right was *clearly established*, courts in this Circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable
> specificity'; (2) whether the decisional law of the Supreme Court and
> the applicable circuit court support the existence of the right in
> question; and (3) whether under preexisting law a reasonable
> defendant official would have understood that his or her acts were
> unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S.

962 (1992).[77]  Regarding the issue of whether *a reasonable person would have known* he was

---

[77]      *See also Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d
Cir. 1993); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994).

violating such a clearly established right, this "objective reasonableness"[78] test is met if "officers

of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Corr. Officer Austin*, 901 F. Supp. 757, 764

(S.D.N.Y. 1995) (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y. 1996).  As

the Supreme Court explained,

> [T]he qualified immunity defense . . . provides ample protection to all
> but the plainly incompetent or those who knowingly violate the law.
>
> . . . Defendants will not be immune if, on an objective basis, it is
> obvious that no reasonably competent officer would have concluded
> that a warrant should issue; but if officers of reasonable competence
> could disagree on this issue, immunity should be recognized.

*Malley*, 475 U.S. at 341.  Furthermore, courts in the Second Circuit recognize that "the use of an

'objective reasonableness' standard permits qualified immunity claims to be decided as a matter

of law."  *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir. 1992]

[citing Supreme Court cases]).

    The Eighth Amendment rights and Fourteenth Amendment rights (that Plaintiff asserts in

his Complaint) have not been clearly established in this District.  *See Bolanos*, 1993 U.S. Dist.

LEXIS 21212, at *28 ("[S]ince it was not clearly established that a white powdery substance

must be tested twice, defendants are entitled to qualified immunity."); *Soto v. Lord*, 693 F. Supp.

8, 17 (S.D.N.Y. 1988) (concluding that the law requiring use of a confirmatory test before

---

[78]     *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official
protected by qualified immunity may be held personally liable for an allegedly unlawful official
action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457
U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects
defendants "even where the rights were clearly established, if it was objectively reasonable for
defendants to believe that their acts did not violate those rights").

accepting urinalysis drug test results as reliable evidence during a disciplinary hearing was not "clearly established" in this district). Even if those rights have been clearly established, a reasonable person could have not known that he was violating Plaintiff's rights--especially here, where absolutely no evidence exists that Defendants were intentionally or recklessly trying to violate Plaintiff's rights.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 29) be **<u>GRANTED</u>**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs*., 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 28, 2005
       Syracuse, New York


George H. Lowe
United States Magistrate Judge